**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                       Criminal Action No. 5:10-CR-45

RAYMOND R. POWELL,

      Defendant.

**REPORT AND RECOMMENDATION THAT
DEFENDANT'S MOTIONS TO SUPPRESS BE DENIED**

**I. Introduction**

This matter comes before the Court on Defendant, Raymond R. Powell's, Motion to Suppress and Motion to Suppress Statements both filed on January 7, 2011.[1] The Court held an evidentiary hearing and argument on January 31, 2011. The United States of America (hereinafter "USA") appeared by Randolph J. Bernard, Esq., in person. Defendant, Raymond R. Powell appeared in person and by counsel Brendan S. Leary, Esq., in person. The USA tendered Plaintiff's Exhibit 1, as well as, the testimony of witnesses Benjamin Forsythe and Nikki Anderson, officers in the Wheeling Police Department. Defendant tendered three (3) exhibits, as well as, the testimony of Bryan Hails, an officer in the Wheeling Police Department. No other testimony was taken nor was any other evidence adduced.

A.     Background

Defendant, Raymond R. Powell, is the only Defendant named in a two-count indictment charging him with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(1); and also possession of a stolen firearm in violation 18 U.S.C. §§ 922(j),

---

[1] Dkt. Nos. 21 & 22, respectively.

924(a)(2). Defendant moves this Court to suppress evidence "obtained in violation of Defendant's constitutional rights under the Fourth Amendment on the day he was arrested, October 1, 2010." See Def.'s Mot., Pg. 1 (Dkt. 21). Defendant also requests this Court to suppress "statements Defendant allegedly made during a custodial interrogation, obtained in violation of Defendant's constitutional rights under the Fourth Amendment." See Def.'s Mot., Pg. 1 (Dkt. 22).

B.  The Motions

    1.  Motion to Suppress.[2]

    2.  Motion to Suppress Statements.[3]

C.  Recommendations

    1.  I recommend Defendant's Motion to Suppress be denied because the 911 call was from a person who identified himself and gave a very detailed description of Defendant and what Defendant was doing, which provided the officers a reasonable and articulable basis for a constitutional Terry stop.

    2.  I recommend the Motion to Suppress Statements be denied because the original Terry stop was lawful.

## II.  Facts

The following telephone call was received by the Wheeling-Ohio County 911 operator 10/1/2010, at 21:30:49:

**911 Dispatch:**  Wheeling Police Dispatch.

---

[2] Dkt. No. 21.

[3] Dkt. No. 22.

| | |
|---|---|
| **Hocutt:** | Hi buddy. This is Travis Hocutt, down here at Hocutt's Barbeque. |
| **911 Dispatch:** | Yeah. |
| **Hocutt:** | Hey I just took that trolley ride and there's this boy that worked for me a few days here and I found out he had a bunch of charges and things like that on him. |
| **911 Dispatch:** | Yeah. |
| **Hocutt:** | And he's in a military uniform, told the bus driver he was in the military and he does have a gun on him. He, he took the magazine out there while we were on the trolley flipping the bullets around. The trolley driver seen the gun too. |
| **911 Dispatch:** | Alright, where . . . What . . . |
| **Hocutt:** | He was right . . . |
| **911 Dispatch:** | What trolley did you take? |
| **Hocutt:** | The one, the free one, the free ride around Wheeling. And he's standing in front of the bus station right now. He just got off the trolley with us. And I know he ain't no military. He worked with me for a few days here. He's the one that walks - the homeless kid that walks around with the red headed girl all around town. |
| **911 Dispatch:** | Yeah. |
| **Hocutt:** | That's him. He's always in trouble. Had his kids taken away and stuff and he does have a gun on him and it is loaded. He had a magazine and was putting bullets in it. |
| **911 Dispatch:** | The, the military uniform, is it a dress uniform? |

| | |
|---|---|
| **Hocutt:** | Yeah it's camouflaged and he's got like a beret hat on. He's got a big knife on him and he's got a gun on him. Freaked me out. |
| **911 Dispatch:** | Alright, what's your name? |
| **Hocutt:** | I'm Travis Hocutt. The one who has the barbeque place here. |
| **911 Dispatch:** | Alright. |
| **Hocutt:** | I just got off the trolley. He got off too. He's standing, he was standing, my wife's out the watching seeing which way he goes. If He goes anywhere. |
| **911 Dispatch:** | Ok. We'll have them come down that way. Are you down there by your building now or what? |
| **Hocutt:** | Yeah. I'm, I'm inside my building right now. |
| **911 Dispatch:** | Alright. |
| **Hocutt:** | My wife's sitting out there at the table watching him. |
| **911 Dispatch:** | Ok. We will go let them know. |
| **Hocutt:** | Alright buddy. Thank you. |
| **911 Dispatch:** | Alright. |

Shortly thereafter the Dispatch Operator made the following dispatch:

| | |
|---|---|
| **Dispatch:** | Dispatch to 7 anybody else for backup. 14th & Main by the bus station ah a homeless guy dressed up in camos, military just took the free trolley ride on the bus he did display a gun, took the clip out had ah was bouncing the bullets in the air. Also has a big knife on him. |
| **Unit:** | 4 in route At 16th & Jacob |

| | |
|---|---|
| **Unit:** | 2 LT north from the Boggs Run Road exit we are heading that way as well |
| **Dispatch:** | 10 4 it's the homeless guy that has the red hair |
| **Unit:** | 4 Main or Market |
| **Dispatch:** | last Unit identify |
| **Unit:** | 4 Main or Market |
| **Dispatch:** | bus station on Main Street where the trolley let the people off. |
| **Dispatch:** | 10 4 |
| **Unit:** | 4 to dispatch . . . . (cannot understand what she said) or ah |
| **Dispatch:** | Military camos with a beret |
| **Unit:** | 4 10 4 |
| **Unit:** detained | 4 everybodys on scene and we got one at this time |
| **Dispatch:** | copy one detained |
| **Unit:** | 2 slowin down |
| **Dispatch:** | 10 4 |

    Two patrol cars - C3 and C4 - arrived at 1401 Main Street, Wheeling, West Virginia, nearly simultaneously, with C3 first and C4 immediately behind. C3 was occupied by Officers Hails and Forsythe. C4 was occupied by Officers Brammer and Anderson. Defendant was walking South on Main Street in a normal manner. All four officers exited the patrol cars, drew their weapons and directed Defendant to be down on the pavement, lay face down on the

5

pavement. Defendant was directed to put his hands behind his back. Defendant put his hands behind his back and was asked if he was carrying a firearm. Defendant answered affirmatively. Defendant was told not to move his hands and was handcuffed. Defendant was patted down. Two firearms, a hunting knife, a magazine for a firearm and four holsters were recovered. Defendant was asked if he had a permit to carry a concealed weapon. Defendant said "no." Defendant was then placed in a patrol car and taken to police headquarters. At police headquarters, Defendant was <u>Mirandized</u> and questioned further.

### III. <u>Motion to Suppress</u>

A.   <u>Contentions of the Parties</u>

In support of his Motion to Suppress, Defendant argues "the police officers' initial stop of [Defendant] Powell was not a temporary, investigative stop...." <u>See</u> Def.'s Mot., Pg. 4 (Dkt. 21). Specifically, Defendant argues the 911 caller did not provide a sufficient basis to allow the police officers to conduct a <u>Terry</u> stop because the 911 caller did not allege any illegal conduct on Defendant's part. Defendant further contends the initial detention was not a temporary detention under <u>Terry</u> but, rather, a formal arrest unsupported by probable cause or the lesser standard of reasonable, articulable suspicion.

In opposition, the Government contends the stop of the Defendant fits properly into the <u>Terry</u> framework based on the information provided by the 911 caller. The Government argues the 911 caller "provided specific information about seeing a specific, identifiable person who was flashing a handgun in public" which permitted the police to "investigate to see if the [D]efendant had a concealed weapons permit, and even if he did, to see if [the Defendant] had used it in such a way as to cause or threaten a breach of the peace." <u>See</u> USA's Resp., Pg. 4 (Dkt.

6

24). The following parts of the 911 call are what the Government contends to be relevant to the Court's determination:

> "All of the following is in the 911 call: The passenger gave his own name and the location of his place of business. The passenger said the Defendant had worked for him for a couple of days. The passenger said the Defendant had charges on him. The passenger described in detail what the Defendant was wearing. The passenger said both he and the driver of the trolley had seen the Defendant with a gun, and additionally, the passenger said he saw the Defendant with a knife, a gun magazine and bullets. The passenger described exactly where the Defendant was then located. The passenger said the gun was loaded. The passenger gave his own name and told 911 where the passenger could be located. The passenger said the incident "freaked him out."

Id. at 4-5.

This information, the Government argues under United States v. Hernandez-Mendez, 626 F.3d 203 (4th Cir. 2010), permitted the police officers to "search the [Defendant] for weapons before continuing with their investigation...." Id. at 4.

B.  Discussion

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). Under this framework, an investigatory stop of a person is constitutional under when it is supported by a reasonable and articulable suspicion that "criminal activity may be afoot." Id. at 31. Under the two-part Terry reasonable suspicion inquiry, a Court must determine whether the officer's action was: 1) "justified at its inception" and 2) "reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 19-20. "Reasonableness" in the context of a Terry stop is given content by balancing the need for the encroachment against its nature case by

7

case and in light of all the attendant circumstances. Atwater v. City of Lago, 532 U.S. 318, 347 (2001). See also United States v. Cortez, 449 U.S. 411, 417-418 (1981) (basis of stop determined from totality of circumstances). The standard is familiar: a police officer may frisk a suspect and search for weapons on reasonable suspicion that the suspect is armed and dangerous. United States v. Hernandez-Mendez, 626 F.3d 203, 207 (4th Cir. 2010). Evidence obtained in violation of a defendant's Fourth Amendment rights, however, must be suppressed unless an exception is applicable. United States v. Perez, 393 F.3d 457, 460 (4th Cir. 2004).

The issue before the Court is whether the police officers had a reasonable, articulable basis to believe criminal activity was afoot. Defendant believes Florida v. J.L., 529 U.S. 266 (2000) is instructive. In Flordia v. J.L., an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Id. at 268. The United States Supreme Court held that an anonymous tip that a person was carrying a gun was, without more, insufficient to justify a police officer's stop and frisk of that person. Id. at 270. It reasoned that the anonymous tip lacked the "moderate indicia of reliability" necessary because the call "provided no predictive information to enable the police to test the informant's knowledge or credibility." Id. at 271. The Court further reasoned an "accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." Id. at 271.

The Court finds Flordia v. J.L. is distinguishable from the present situation on several issues. Here, the 911 caller was not an anonymous informant. The 911 caller provided his name

8

and identified himself as a local businessman in the Wheeling, West Virginia area. The 911 caller gave a specific description of the Defendant inclusive of the following: 1) what Defendant was wearing; 2) whom Defendant knew; 3) that the 911 caller had employed Defendant at one time; 4) that Defendant displayed a loaded firearm; 5) that Defendant displayed the firearm magazine, 6) that Defendant put bullets in the firearm magazine; 7) that Defendant possessed a big knife; and 8) that Defendant had "freaked [] out" the 911 caller with Defendant's actions. The 911 caller also advised he was inside his business and could still see the Defendant.

     The anonymous tipster in Flordia v. J.L. was deficient because the tipster did not provide the police with a "moderate indicia of reliability" that the tipster had "knowledge of concealed criminal activity." That is not present in this situation. The tip, here, was not anonymous. Instead, the 911 caller identified himself, the Defendant and the 911 caller's interactions with Defendant. The 911 caller had personal knowledge that Defendant was carrying a firearm because the 911 caller had observed Defendant and was still observing Defendant. Additionally, the 911 caller was able to sufficiently identify what clothing Defendant was wearing and the police officers responded to the 911 call within minutes of dispatch. The Court finds the 911 caller provided indicia of reliability sufficient to give the police with a means to test his knowledge or credibility. The 911 caller was a known person whose reputation could be could be assessed and who could be held accountable should his allegations prove to be false. Further, the 911 caller knew Defendant had much at stake if false information was provided. Considering this information altogether, lends support to the 911 caller's credibility and reliability. Accordingly, the Court finds the stop and frisk of Defendant to be proper because it was justified in its inception based on the information provided by the 911 caller and the stop and frisk was

reasonably related in scope to the circumstances justifying the interference in the first place. The totality of the circumstances were such that the police were required to respond for public safety– which is the police department's primary concern.

Defendant also argues that reasonable, articulable suspicion providing the police officers with a constitutional basis to stop Defendant, must exist prior to the stop and must not be determined after the fact. The case of United States v. Quarles, 330 F.3d 650 (4th Cir. 2003) is explanatory in this regard. In Quarles, a 911 caller stated he saw the defendant walking down a street with a large bag containing a shotgun and advised the police that the defendant was currently wanted by the U.S. Attorney's Office. Id. at 652. Based on that call, police officers stopped the defendant and found the bag containing the shotgun discarded a short distance from the defendant. Id. at 653. In holding that the stop was proper under the Terry framework, the Quarles court reasoned that the 911 caller in Quarles gave enough information 1) to test his knowledge or credibility and 2) so he could be identified later. Id. at 655. The Quarles 911 caller, similar to this 911 caller, identified himself, knew the Defendant, provided a description of Defendant and the clothes Defendant was wearing, knew the Defendant had a firearm, and kept the Defendant in sight until the police officers arrived. The sole difference between Quarles and the present case is that there was no warrant for Defendant Powell as there was in Quarles, however, the similarities between the two cases are strikingly similar. Therefore, the Court finds that at the time the police officers stopped Defendant, they had a reasonable, articulable suspicion that criminal activity was afoot to properly conduct a Terry stop and frisk of Defendant.

C.      Recommendation

For the foregoing reasons, I recommend Defendant's Motion to Suppress be **DENIED**.

### IV. Motion to Suppress Statements

A.   Contentions of the Parties

In support of his Motion to Suppress Statements, Defendant argues the statements Defendant made about whether Defendant "had any weapons on his person, whether he had a permit to carry concealed weapons, and whether [Defendant] had a military ID" should be suppressed. See Def.'s Mot., Pg. 2 (Dkt. 22).  Specifically, Defendant contends the police officers' questioning and Defendant's "alleged statements in response to those questions violate the rule of Miranda." Id.

The Government asserts that Defendant's statements "were preceded by Miranda warnings and are therefore admissible." See USA's Resp., Pg. 6 (Dkt 24).

B.   Discussion

The Court does not discuss, at length, a substantive analysis of Defendant's Motion because this issue is resolved by the Court's decision on the Terry stop and frisk.  Briefly, if the Terry stop and frisk was constitutional, these statements are not suppressed because the officers had a reasonable, articulable suspicion that criminal activity was afoot and were within the parameters of the Terry framework to ask limited questions.  If the Terry stop and frisk were not constitutional, Defendants statements must be suppressed because they would constitute fruits of the poisonous tree, unless the Government proffered an applicable exception.  The Court has found the Terry stop and frisk constitutional based on the above-mentioned analysis.  Moreover, Miranda comes into play when there is both 1) custody and 2) interrogation. See Miranda v. Arizona, 384 U.S. 436 (1966).  Here, while the officers testified Defendant was not free to leave,

the Court does not find the questioning to constitute interrogation in the sense of requiring Miranda warnings to be read. The officers asked limited questions for purposes of officer and public safety. Accordingly, the police officers' questions of Defendant and Defendant's responses thereto and subsequent arrest must not be suppressed.

C. Recommendation

For the foregoing reasons, I recommend the Motion to Suppress Statements be **DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: February 11, 2011 /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE